## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAWRENCE HOLLIN, derivatively on behalf of REGENERON PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> LEONARD S. SCHLEIFER, CHRISTOPHER FENIMORE, ROBERT LANDRY, BONNIE L. BASSLER, MICHAEL S. BROWN, N. ANTHONY COLES, JOSEPH L. GOLDSTEIN, KATHRYN GUARINI, CHRISTINE A. POON, ARTHUR F. RYAN, DAVID P. SCHENKEIN, GEORGE L. SING, CRAIG B. THOMPSON, GEORGE D. YANCOPOULOS, and HUDA Y. ZOGHBI, <br><br> Defendants, <br><br> and <br><br> REGENERON PHARMACEUTICALS, INC., <br><br> Nominal Defendant. | Case No.: 1:25-cv-00651 <br><br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Lawrence Hollin ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively

and on behalf of Nominal Defendant Regeneron Pharmaceuticals, Inc. ("Regeneron" or the

"Company"), files this Verified Shareholder Derivative Complaint against defendants Leonard S.

Schleifer ("Schleifer"), Christopher Fenimore ("Fenimore"), Robert Landry ("Landry"), Bonnie

L. Bassler ("Bassler"), Michael S. Brown ("Brown"), N. Anthony Coles ("Coles"), Joseph L.

Goldstein ("Goldstein"), Kathryn Guarini ("Guarini"), Christine A. Poon ("Poon"), Arthur F. Ryan

("Ryan"), David P. Schenkein ("Schenkein"), George L. Sing ("Sing"), Craig B. Thompson ("Thompson"), George D. Yancopoulos ("Yancopoulos"), and Huda Y. Zoghbi ("Zoghbi") (collectively, the "Individual Defendants," and together with Regeneron, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Regeneron, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Schleifer, Fenimore, and Landry for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Regeneron, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from November 2, 2023 through October 31, 2024, both dates inclusive (the "Relevant Period").

2.      Regeneron is a biotechnology company that designs, develops, produces, and sells medical treatments for, *inter alia*, eye disease, allergic and inflammatory diseases, cardiovascular

disease, and cancer.

3.      One of Regeneron's main products is Eylea, which is an injection that is used to treat age-related macular degeneration. Eylea purportedly does this by impeding the anti-vascular endothelial growth factor ("anti-VEGF"). The United States Food and Drug Administration ("FDA") approved Eylea for use as an anti-VEGF inhibitor in treatment for age-related macular degeneration in November 2011. Years later, in August 2023, a high dose version of Eylea, called Eylea HD, was approved by the FDA.

4.      Eylea is characterized as a "buy-and-bill" drug, which means that physicians and their practices incur upfront expenses to purchase Eylea that payors reimburse later on. Typically, physicians buy Eylea from third-party distributors, and after the physicians administer Eylea to patients, the physicians' practices submit claims requesting to be reimbursed by Medicare or other payors. The reimbursement rates for every claim submitted for Eylea and Eylea HD are based on the Average Sales Price ("ASP") for the drug, which the Company must report to the Centers for Medicare and Medicaid Services ("CMS") on a quarterly basis. The ASP is properly calculated by determining the average price for sales of the drug in the United States, minus price concessions. Indeed, in reporting a drug's ASP, companies must include all price concessions as part of their calculation, including volume discounts, chargebacks, and rebates.

5.      Sales of Eylea and Eylea HD depend heavily on the availability and extent of reimbursement from third-party payors, including Medicare and Medicaid programs. Eylea and other physician-administered drugs are reimbursed by Medicare Part B based on the ASP of a drug less the applicable patient co-pay. Reimbursement rates typically reflect a drug's ASP plus 6%. A drug's "spread" is the difference between the Medicare reimbursement rate and the amount the customer actually pays to buy the drug, meaning the spread makes up the customer's profit on the

drug. As such, when a manufacturer overstates a drug's ASP, it inappropriately increases the profit that a customer receives for each claim the customer submits to Medicare. Therefore, if a drug manufacturer fails to report all price concessions on its drug, its ASP becomes artificially inflated, which increases the profit customers receive on each claim that Medicare reimburses.

6.      At all relevant times, the Company was aware that distributors were charged credit card processing fees when customers used credit cards, and that due to the foregoing, distributors frequently charged retina practices a higher price to use credit cards for high-cost drugs like Eylea as a way to offset the cost of those fees. Thus, customers who made payments for Eylea with credit cards often paid a higher price than customers paying in cash. During the Relevant Period, the Company paid its distributors for the credit card processing fees so that they would offer the lower cash pricing for Eylea to customers. Regeneron knew that these payments constituted price concessions to Eylea customers, as they were now able to use credit cards at that lower price, yet the Company failed to incorporate these concessions when calculating its ASP.

7.      Indeed, unbeknownst to the general public during the Relevant Period, the reimbursement reports Regeneron submitted to CMS omitted the fact that Regeneron was paying distributors' credit card service fees so as to avoid those fees being passed on to customers, a subsidy that required reporting under CMS regulations. In other words, Regeneron's practice reimbursed distributors for credit card processing fees on the condition that the distributors would use those payments to lower the effective price they charged for Eylea to doctors and retina practices using credit cards. This was done to allow Regeneron's customers to pay for Eylea using credit cards at no additional cost and further allowed them to reap the benefits of cashback rewards and other credit card benefits on their purchases of Eylea, making Eylea more cost efficient than its competitors for customers. As a result of this practice, the Company has paid hundreds of

4

millions of dollars subsidizing the cost of Eylea without reporting these payments as "price concessions" to CMS in its ASP reports, thereby inflating Eylea's reimbursement rates from Medicare (collectively, the "Credit Card Fee Misconduct").

8.      During the Relevant Period, Defendants concealed this misconduct, instead choosing to highlight the Company's revenues and Eylea sales while downplaying the risks associated with the Credit Card Fee Misconduct.

9.      The truth began to emerge on April 10, 2024, when the United States Department of Justice ("DOJ") revealed that it had filed a complaint (the "DOJ Complaint") against Regeneron alleging violations of the False Claims Act (the "DOJ Action"). The DOJ Complaint specifically alleged that Regeneron was engaging in the Credit Card Fee Misconduct by failing to report millions of dollars in discounts it was providing to drug distributors through reimbursed credit card fees. Due to the foregoing, the DOJ alleged that the Company had inflated Eylea's ASP, which improperly increased Medicare reimbursements for the drug. In other words, through the process of reimbursing credit card fees, the Company was able to subsidize the treatment costs, effectively gaining a competitive advantage over its competitors in the anti-VEGF treatment industry.

10.     On this news, the price of the Company's common stock fell $31.50 per share over two trading days, or approximately 3.36%, from a closing price of $936.20 per share on April 10, 2024, to a closing price of $904.70 per share on April 12, 2024. However, the Individual Defendants continued to obfuscate the truth about Eylea's inflated ASP and the resulting inappropriately inflated Medicare reimbursement rates for Eylea.

11.     The truth did not fully emerge until October 31, 2024, when, before the market opened, the Company issued a press release announcing its financial and operational results for the third quarter (the "Q3 2024 Earnings Release") of the fiscal year ended December 31, 2024

(the "2024 Fiscal Year"). The Q3 2024 Earnings Release revealed disappointing results from the third quarter. Specifically, the Q3 2024 Earnings Release revealed that "[n]et product sales of EYLEA in the third quarter of 2024 were adversely impacted by a lower net selling price compared to the third quarter of 2023." In addition, Regeneron revealed that sales had only increased 3% versus the third quarter of 2023, and that quarterly sales of Eylea HD were only $392 million, thus missing consensus estimates of $415 million to $425 million.

12.     On this news, the price of the Company's common stock fell $84.59 per share, or approximately 9.2%, from a closing price of $922.79 per share on October 30, 2024, to a closing price of $838.20 per share on October 31, 2024.

13.     During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and/or directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company paid credit card fees to distributors so those distributors would not charge Eylea customers extra for use of a credit card; (2) these payments were considered a subsidy for customer purchases of Eylea which ultimately lowered the price of the product; (3) by not reporting these payments, the Company reported a higher ASP than Eylea actually had to federal agencies in violation of the False Claims Act; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused

the Company to fail to maintain adequate internal controls and caused the Company to participate in the Credit Card Fee Misconduct.

15.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Regeneron to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between December 2023 and September 2024, approximately 1,079,733 shares of Regeneron common stock were repurchased, costing the Company over $2.1 billion. As the Company's stock was actually worth only $838.20 per share, the price at which it was trading when markets closed on October 31, 2024, the Company overpaid for repurchases of its own stock *by approximately $310.3 million in total*.

16.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while ten of the Individual Defendants engaged in improper insider sales, *netting combined total proceeds of approximately $147.6 million.*

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its former CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to being named as a defendant in the DOJ Action, the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged

herein—the Company will have to expend many millions of dollars.

19.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, their collective engagement in and/or facilitation of the Company's engagement in the Credit Card Fee Misconduct, the substantial likelihood of the directors' liability in this derivative action, of the CEO's, the CFO's, the former CFO's, and the Company's liability in the Securities Class Action, the Company's liability in the DOJ Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

24.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

25.    Plaintiff is a current shareholder of Regeneron. Plaintiff has continuously owned Company common stock at all relevant times.

### Nominal Defendant Regeneron

26.    Regeneron is a New York corporation with its principal executive offices at 777 Old Saw Mill River Road, Tarrytown, New York 10591-6707. Regeneron's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "REGN."

### Defendant Schleifer

27.    Defendant Schleifer founded Regeneron in 1988. Since doing so, he has served as the President, CEO, and as a director of the Company. Since 2023, Defendant Schleifer has also served as the Co-Chair of the Board. In addition, he serves as a member of the Technology Committee. According to the proxy statement that the Company filed with the SEC on April 25, 2024 (the "2024 Proxy Statement"), as of April 16, 2024, Defendant Schleifer beneficially owned 3,294,518 shares of Regeneron common stock. Given that the price per share of the Company's

common stock at the close of trading on April 16, 2024 was $894.14, Defendant Schleifer owned

approximately $2.9 billion worth of Regeneron stock as of that date.

28.    For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant

Schleifer received $8,184,338 in total compensation from the Company. This included $1,875,415

in salary, $4,275,946 in non-equity incentive plan compensation, and $2,032,977 in all other

compensation.

29.    During the Relevant Period, while the Company's stock price was artificially

inflated and before the scheme was exposed, Defendant Schleifer made the following sales of

Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|-----------------------|--------------|
| May 14, 2024 | 25,000 | $979.63 | $24,490,750 |
| May 15, 2024 | 10,941 | $984.03 | $10,766,239 |
| May 17, 2024 | 22,830 | $797.64 | $22,365,295 |
| June 6, 2024 | 787 | $1,015 | $798,820 |
| June 11, 2024 | 9,064 | $1,015.66 | $9,205,942 |
| June 12, 2024 | 16,149 | $1,019.06 | $16,456,848 |

Thus, in total, before the fraud was exposed, Defendant Schleifer sold 84,771 shares of Company

stock on inside information, for which he received approximately $84.1 million in total proceeds.

His insider sales, made with knowledge of material nonpublic information before the material

misstatements and omissions were exposed, demonstrate his motive in facilitating and

participating in the scheme.

30.    The 2024 Proxy Statement stated the following about Defendant Schleifer:

Dr. Schleifer's significant industry and leadership experience, as well as his

incomparable knowledge of the Company and an in-depth understanding of the complex research, drug development, and business issues facing companies in the biopharmaceutical sector, led the board to conclude that Dr. Schleifer should serve as a director.

**Defendant Landry**

31.     Defendant Landry served as the Company's CFO from September 2013 until February 2024. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Landry beneficially owned 86,714 shares of Regeneron common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant Landry owned approximately $77.5 million worth of Regeneron stock as of that date.

32.     For the 2023 Fiscal Year, Defendant Landry received $1,904,476 in total compensation from the Company. This included $881,406 in salary, $996,870 in non-equity incentive plan compensation, and $26,200 in all other compensation.

33.     The proxy statement that the Company filed with the SEC on April 21, 2023 (the "2023 Proxy Statement"), stated the following about Defendant Landry:

> **Robert E. Landry,** 59, has been Executive Vice President, Finance since January 2019 and Chief Financial Officer since October 2013. From September 2013 to December 2018, he served as Senior Vice President, Finance. Previously, Mr. Landry served as Senior Vice President, Treasurer, at Pfizer Inc. from October 2012 to August 2013 and Senior Vice President—Finance, Pfizer's Diversified Business, from October 2009 to October 2012. Prior to those roles, Mr. Landry held a number of positions at Wyeth, which was acquired by Pfizer Inc. in October 2009, including Treasurer and Principal Corporate Officer from 2007 to 2009, Director of Pharmaceutical Marketing and Sales of Wyeth's Australian affiliate from 2006 to 2007, and Chief Financial Officer of Wyeth's Australian and New Zealand affiliates from 2004 to 2006. Mr. Landry holds a B.B.A. in Accounting from the University of Notre Dame.

**Defendant Fenimore**

34.     Defendant Fenimore has served as the Company's Senior Vice President, Finance and CFO since February 2024. Previously, he served as the Senior Vice President, Controller from

January 2021 until taking over his current role.

35.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Fenimore made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| December 21, 2023 | 1,680 | $843.94 | $1,417,819 |
| December 22, 2023 | 250 | $846.27 | $211,567 |
| December 27, 2023 | 2,448 | $856.71 | $2,097,226 |
| February 9, 2024 | 4,919 | $953 | $4,687,428 |
| August 28, 2024 | 5,680 | $1,205.76 | $6,848,711 |

Thus, in total, before the fraud was exposed, Defendant Fenimore sold 14,977 shares of Company stock on inside information, for which he received approximately $15.3 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

36.    The 2024 Proxy Statement stated the following about Defendant Fenimore:

**Christopher Fenimore,** 53, has been Senior Vice President, Finance and Chief Financial Officer since February 2024. He previously served as Senior Vice President, Controller from January 2021 to February 2024, as Vice President, Controller from March 2017 to December 2020, as Vice President, Deputy Controller from January 2017 to March 2017, and as Vice President, Financial Planning from January 2012 to December 2016. Prior to joining the Company in 2003, he was Vice President, Finance for a biotechnology start-up and worked in other healthcare industry-focused venture capital and investment banking roles. Mr. Fenimore started his career as an auditor at KPMG and is a Certified Public Accountant in the State of New York. Mr. Fenimore holds an M.A. in Biotechnology from Columbia University, an M.B.A. in Professional Accounting from Rutgers Business School, and a B.A. in Economics from Rutgers University.

**Defendant Bassler**

12

37.     Defendant Bassler has served as a Company director since 2016. Defendant Bassler also serves as a member of the Technology Committee and the Corporate Governance and Compliance Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Bassler beneficially owned 19,248 shares of Regeneron common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant Bassler owned approximately $17.2 million worth of Regeneron stock as of that date.

38.     For the 2023 Fiscal Year, Defendant Bassler received $709,987 in total compensation from the Company. This included $110,000 in fees earned or paid in cash, $119,772 in stock awards, and $480,215 in option awards.

39.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bassler made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| December 13, 2023 | 610 | $870.00 | $530,700 |
| January 3, 2024 | 826 | $914.00 | $754,964 |
| January 30, 2024 | 827 | $959.00 | $793,093 |
| February 26, 2024 | 854 | $979.25 | $836,279 |
| June 5, 2024 | 827 | $1,011.00 | $836,097 |
| June 24, 2024 | 756 | $1,062.00 | $802,872 |
| August 2, 2024 | 756 | $1,115.00 | $842,940 |
| August 15, 2024 | 756 | $1,170.00 | $884,520 |

Thus, in total, before the fraud was exposed, Defendant Bassler sold 6,212 shares of Company

stock on inside information, for which she received approximately $6.3 million in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

40.    The 2024 Proxy Statement stated the following about Defendant Bassler:

> Dr. Bassler's extensive research experience and her scientific and academic career and accomplishments, as well as her experience as a corporate director, led to the board to conclude that Dr. Bassler should serve as a director.

**Defendant Brown**

41.    Defendant Brown has served as a Company director since 1991. He also serves as the Chair of the Technology Committee and as a member of the Corporate Governance and Compliance Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Brown beneficially owned 17,825 shares of Regeneron common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant Brown owned approximately $15.9 million worth of Regeneron stock as of that date.

42.    For the 2023 Fiscal Year, Defendant Brown received $728,987 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $119,772 in stock awards, $480,215 in option awards, and $9,000 in all other compensation.

43.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Brown made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| December 27, 2023 | 2,049 | $898.00 | $1,840,002 |

| May 28, 2024 | 1,172 | $974.86 | $1,142,535 |
| June 14, 2024 | 1,535 | $1,040.00 | $1,596,400 |

Thus, in total, before the fraud was exposed, Defendant Brown sold 4,756 shares of Company stock on inside information, for which he received approximately $4.6 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

44.    The 2024 Proxy Statement stated the following about Defendant Brown:

Dr. Brown's distinguished scientific and academic background, including his receipt of the Nobel Prize for Physiology or Medicine in 1985, and his significant industry experience gained through his service on the board of directors of the Company and the board of directors of a leading pharmaceutical company, led the board to conclude that Dr. Brown should serve as a director.

**Defendant Coles**

45.    Defendant Coles has served as a Company director since 2017. Defendant Coles also serves a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Coles beneficially owned 6,674 shares of Regeneron common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant Coles owned approximately $6 million worth of Regeneron stock as of that date.

46.    For the 2023 Fiscal Year, Defendant Coles received $704,987 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $119,772 in stock awards, $480,215 in option awards, and $5,000 in all other compensation.

47.    The 2024 Proxy Statement stated the following about Defendant Coles:

Dr. Coles's experience as a seasoned executive and corporate director with extensive knowledge of highly regulated biopharmaceutical and pharmaceutical

companies, as well as his in-depth knowledge and understanding of the regulatory environment in which Regeneron operates, led to the board's decision to nominate Dr. Coles for reelection to the board.

**Defendant Goldstein**

48.     Defendant Goldstein has served as a Company director since 1991. He also serves as a member of the Technology Committee and the Corporate Governance and Compliance Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Goldstein beneficially owned 8,956 shares of Regeneron common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant Goldstein owned approximately $8 million worth of Regeneron stock as of that date.

49.     For the 2023 Fiscal Year, Defendant Goldstein received $709,987 in total compensation from the Company. This included $110,000 in fees earned or paid in cash, $119,772 in stock awards, and $480,215 in option awards.

50.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Goldstein made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|-----------------------|--------------|
| January 23, 2024 | 2,707 | $950.00 | $2,571,650 |

Thus, in total, before the fraud was exposed, Defendant Goldstein sold 2,707 shares of Company stock on inside information, for which he received approximately $2.6 million in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

51.    The 2024 Proxy Statement stated the following about Defendant Goldstein:

Dr. Goldstein's extensive research experience, his distinguished scientific and academic credentials, including his receipt of the Nobel Prize for Physiology or Medicine in 1985, and his substantial understanding of the Company gained through his service as a director, led the board to conclude that Dr. Goldstein should serve as a director.

**Defendant Guarini**

52.    Defendant Guarini has served as a Company director since September 2023. She also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Guarini beneficially owned 2,526 shares of Regeneron common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant Guarini owned approximately $2.3 million worth of Regeneron stock as of that date.

53.    For the 2023 Fiscal Year, Defendant Guarini received $1,031,155 in total compensation from the Company. This included $31,250 in fees earned or paid in cash, $199,975 in stock awards, and $799,930 in option awards.

54.    The 2024 Proxy Statement stated the following about Defendant Guarini:

Dr. Guarini's experience as an executive of a major corporation and extensive knowledge of information technology, data security, and artificial intelligence matters led to the board's decision to nominate Dr. Guarini for reelection to the board.

**Defendant Poon**

55.    Defendant Poon has served as a Company director since 2010 and has served as the Company's Lead Independent Director since 2023. She also serves as the Chair of the Compensation Committee and as a member of the Corporate Governance and Compliance Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Poon beneficially owned 54,530 shares of Regeneron common stock. Given that the price per share of

the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant

Poon owned approximately $48.8 million worth of Regeneron stock as of that date.

56.    For the 2023 Fiscal Year, Defendant Poon received $748,009 in total

compensation from the Company. This included $148,022 in fees earned or paid in cash, $119,772

in stock awards, and $480,215 in option awards.

57.    During the Relevant Period, while the Company's stock price was artificially

inflated and before the scheme was exposed, Defendant Poon made the following sale of Company

common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| August 15, 2024 | 10,838 | $1,158.39 | $12,554,587 |

Thus, in total, before the fraud was exposed, Defendant Poon sold 10,838 shares of Company

stock on inside information, for which she received approximately $12.6 million in total

proceeds. Her insider sale, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed, demonstrates her motive in facilitating and

participating in the scheme.

58.    The 2024 Proxy Statement stated the following about Defendant Poon:

Ms. Poon's extensive expertise in domestic and international business operations,
including sales and marketing and commercial operations, and her deep strategic
and operational knowledge of the pharmaceutical industry, led the board to
conclude that Ms. Poon should serve as a director.

**Defendant Ryan**

59.    Defendant Ryan has served as a Company director since 2003. He also serves as

the Chair of the Corporate Governance and Compliance Committee and as a member of the Audit

Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Ryan

beneficially owned 23,463 shares of Regeneron common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant Ryan owned approximately $21 million worth of Regeneron stock as of that date.

60.     For the 2023 Fiscal Year, Defendant Ryan received $724,987 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $119,772 in stock awards, $480,215 in option awards, and $5,000 in all other compensation.

61.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Ryan made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| February 1, 2024 | 100 | $952.51 | $95,250 |
| March 1, 2024 | 100 | $978.23 | $97,823 |
| April 1, 2024 | 100 | $961.56 | $96,156 |
| May 1, 2024 | 100 | $901.47 | $90,146 |
| July 1, 2024 | 100 | $1,059.06 | $105,906 |
| August 1, 2024 | 1 | $1,100.03 | $1,100 |
| August 1, 2024 | 99 | $1,081.77 | $107,095 |
| September 3, 2024 | 100 | $1,179.76 | $117,975 |
| October 1, 2024 | 100 | $1,049.73 | $104,972 |

Thus, in total, before the fraud was exposed, Defendant Ryan sold 800 shares of Company stock on inside information, for which he received approximately $816,423 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and

participating in the scheme.

62.     The 2024 Proxy Statement stated the following about Defendant Ryan:

Mr. Ryan's substantial leadership experience as a chief executive officer of leading companies in the banking and insurance industries, and his extensive business experience and financial expertise, led to the board's decision to nominate Mr. Ryan for reelection to the board.

**Defendant Schenkein**

63.     Defendant Schenkein has served as a Company director since September 2023. He also serves as a member of the Technology Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Schenkein beneficially owned 2,526 shares of Regeneron common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant Schenkein owned approximately $2.3 million worth of Regeneron stock as of that date.

64.     For the 2023 Fiscal Year, Defendant Schenkein received $1,031,155 in total compensation from the Company. This included $31,250 in fees earned or paid in cash, $199,975 in stock awards, and $799,930 in option awards.

65.     The 2024 Proxy Statement stated the following about Defendant Schenkein:

Dr. Schenkein's extensive leadership experience as an executive and corporate director in the pharmaceutical and healthcare industries, as well as his considerable research and academic experience, led to the board's decision to nominate Dr. Schenkein for reelection to the board.

**Defendant Sing**

66.     Defendant Sing has served as a Company director since 1988. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Sing beneficially owned 75,357 shares of Regeneron common stock. Given that the price per share of the Company's common

stock at the close of trading on April 16, 2024 was $894.14, Defendant Sing owned approximately

$67.4 million worth of Regeneron stock as of that date.

67.    For the 2023 Fiscal Year, Defendant Sing received $724,987 in total compensation

from the Company. This included $120,000 in fees earned or paid in cash, $119,772 in stock

awards, $480,215 in option awards, and $5,000 in all other compensation.

68.    During the Relevant Period, while the Company's stock price was artificially

inflated and before the scheme was exposed, Defendant Sing made the following sales of Company

common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| February 8, 2024 | 500 | $945.00 | $472,500 |
| February 9, 2024 | 500 | $945.00 | $472,500 |
| February 22, 2024 | 3,000 | $965.00 | $2,895,000 |
| February 23, 2024 | 500 | $985.00 | $492,500 |
| February 26, 2024 | 1,000 | $992.50 | $992,500 |

Thus, in total, before the fraud was exposed, Defendant Sing sold 5,500 shares of Company stock

on inside information, for which he received approximately $5.3 million in total proceeds. His

insider sales, made with knowledge of material nonpublic information before the material

misstatements and omissions were exposed, demonstrate his motive in facilitating and

participating in the scheme.

69.    The 2024 Proxy Statement stated the following about Defendant Sing:

Mr. Sing's extensive healthcare and financial expertise as a healthcare venture
capital investor and biomedical company chief executive officer, his executive
leadership experience, and his substantial knowledge of the Company led to the
board's decision to nominate Mr. Sing for reelection to the board.

**Defendant Thompson**

70.    Defendant Thompson has served as a Company director since 2022. He also serves as a member of the Technology Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Thompson beneficially owned 4,792 shares of Regeneron common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant Thompson owned approximately $4.3 million worth of Regeneron stock as of that date.

71.    For the 2023 Fiscal Year, Defendant Thompson received $247,785 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $29,036 in stock awards, and $118,750 in option awards.

72.    The 2024 Proxy Statement stated the following about Defendant Thompson:

Dr. Thompson's extensive research and leadership experience in the pharmaceutical and healthcare industries, as well as his experience as a corporate director, led the board to conclude that Dr. Thompson should serve as a director.

**Defendant Yancopoulos**

73.    Defendant Yancopoulos has served as a Company director since 2021 and as the Co-Chair of the Board since June 2023. He also serves as a member of the Technology Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Yancopoulos beneficially owned 1,953,137 shares of Regeneron common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant Yancopoulos owned approximately $1.7 billion worth of Regeneron stock as of that date.

74.    For the 2023 Fiscal Year, Defendant Yancopoulos received $7,759,830 in total compensation from the Company. This included $1,875,415 in salary, $4,275,946 in non-equity incentive plan compensation, and $1,608,469 in all other compensation.

75.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Yancopoulos made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| January 2, 2024 | 16,848 | $900.00 | $15,163,200 |

Thus, in total, before the fraud was exposed, Defendant Yancopoulos sold 16,848 shares of Company stock on inside information, for which he received approximately $15.2 million in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

76.    The 2024 Proxy Statement stated the following about Defendant Yancopoulos:

Dr. Yancopoulos's significant industry and scientific experience and distinguished record of scientific expertise, as well as his extensive knowledge of the Company and an in-depth knowledge of the Company's technologies and research and development programs, led the board to conclude that Dr. Yancopoulos should serve as a director.

**Defendant Zoghbi**

77.    Defendant Zoghbi has served as a Company director since 2016. She also serves as a member of the Technology Committee and the Compensation Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Zoghbi beneficially owned 28,298 shares of Regeneron common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $894.14, Defendant Zoghbi owned approximately $25.3 million worth of Regeneron stock as of that date.

78.    For the 2023 Fiscal Year, Defendant Zoghbi received $714,987 in total

compensation from the Company. This included $110,000 in fees earned or paid in cash, $119,772 in stock awards, $480,215 in option awards, and $5,000 in all other compensation.

79. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Zoghbi made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| January 2, 2024 | 1,117 | $900.00 | $1,005,300 |

Thus, in total, before the fraud was exposed, Defendant Zoghbi sold 1,117 shares of Company stock on inside information, for which she received approximately $1 million in total proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

80. The 2024 Proxy Statement stated the following about Defendant Zoghbi:

Dr. Zoghbi's extensive research experience and her scientific and academic career and accomplishments led the board to conclude that Dr. Zoghbi should serve as a director.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

81. By reason of their positions as officers, directors, and/or fiduciaries of Regeneron and because of their ability to control the business and corporate affairs of Regeneron, the Individual Defendants owed Regeneron and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Regeneron in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Regeneron and its shareholders so as

to benefit all shareholders equally.

82.    Each director and officer of the Company owes to Regeneron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

83.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Regeneron, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

84.    To discharge their duties, the officers and directors of Regeneron were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

85.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Regeneron, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Regeneron's Board at all relevant times.

86.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

87.    To discharge their duties, the officers and directors of Regeneron were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Regeneron were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York and the United States, and pursuant to Regeneron's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Regeneron conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business

and internal affairs of Regeneron and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Regeneron's operations would comply with all applicable laws and Regeneron's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

88.    Each of the Individual Defendants further owed to Regeneron and the shareholders the duty of loyalty requiring that each favor Regeneron's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

89.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Regeneron and were at all times acting within the course and scope of such agency.

90.     Because of their advisory, executive, managerial, directorial, and controlling positions with Regeneron, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

91.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Regeneron.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

92.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

93.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

94.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and

individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Regeneron was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

95.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

96.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Regeneron, and was at all times acting within the course and scope of such agency.

## REGENERON'S CODE OF CONDUCT

97.     Regeneron's Code of Conduct represents that it is applicable to "all officers, directors, and personnel . . . of Regeneron." Additionally, the Code of Conduct states that "acting ethically and with integrity is essential to the safety of our patients and to our business success."

98.     Under the heading "Regeneron's Compliance Program," the Code of Conduct states the following, in relevant part:

> The effectiveness of Regeneron's Compliance Program begins with the support and public commitment of the Company's leadership. The members of the Company's Board of Directors, the Chief Executive Officer (CEO), and the members of [Regeneron's] senior leadership team are committed to governing and growing the Company through ethical and compliant business strategies.

99.     Under the heading "Our Marketplace Responsibilities," the Code of Conduct states

the following, in relevant part:

> We operate in a myriad of requirements around the world designed to protect patients and research subjects. There are also laws and regulations designed to assure taxpayer funds used to buy medicine are appropriately spent. We support these goals and are committed to operating our business with integrity and in compliance with local, state, federal, and international laws and regulations.

> * * *

> Regeneron's commitment to develop and manufacture safe and effective products and legally and ethically promote their benefits to patients and their providers requires full compliance with all laws and regulations governing research, development, manufacturing, and commercialization of its products.

100.    Under the same heading, in a subsection titled "Responsible Pricing & Access," the Code of Conduct states, in relevant part, that "[w]e believe medicines are only useful if patients in need can access and afford them. We are committed to ensuring that our approach to pricing, as well as access and affordability of our medicines is ethical and legally compliant."

101.    Regarding "Proper Use of Company Assets," the Code of Conduct states that "[w]e are all responsible for protecting Company assets against loss, theft, or other misuse."

102.    Under the heading "Maintaining Books and Records," the Code of Conduct states the following, in relevant part:

> Regeneron is committed to maintaining and supplying accurate books and records for all of our transaction and Company data. Our records serve as the basis for managing our business and are necessary for meeting critical obligations to our stakeholders, including patients, shareholders, customers, partners, employees, government agencies, and others with whom we do business.

> All of Regeneron's books, records, and accounts must completely and accurately reflect the true nature of our business transactions and Company data in reasonable detail. All transactions must be authorized and recorded in compliance with Regeneron policies and applicable laws in a timely manner. Falsifying records and entries or misrepresenting facts or information could violate the law and result in severe penalties.

103.    Under the heading "Financial Integrity," the Code of Conduct states the following,

in relevant part:

> Regeneron has legal responsibilities to make complete, accurate, and timely disclosures in all reports and documents that we file with government agencies. Financial records include those that we report publicly, such as those contained in our U.S. Securities and Exchange Commission filings, but also other internal records that contain financial information and form the foundation for our public and other official disclosures.

104.     Under the heading "Insider Trading," the Code of Conduct states the following, in

relevant part:

> There may be times in the course of your job when you come across material, non-public information about our Company, our products or product candidates, or other matters relating to Regeneron. Regeneron policy and the laws of many jurisdictions (particularly the U.S. where Regeneron's shares are publicly traded) prohibit employees anywhere in the world, directly or indirectly through their families or others, from purchasing or selling, or otherwise engaging in any transactions involving Regeneron securities while in the possession of material, non - public information (insider information). Securities are defined very broadly, and include stock, options, puts, calls, publicly traded debt, and stock held in a retirement savings account. It does not matter whether profit was made or losses avoided.

105.     Under the heading "Media and External Communications," the Code of Conduct

states, in relevant part, that "[w]e provide accurate information to all of our stakeholders."

106.     In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in

the Credit Card Fee Misconduct and issue materially false and misleading statements to the public,

and to facilitate and disguise the Individual Defendants' violations of law, including breaches of

fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust

enrichment, and violations of the Exchange Act. Moreover, ten of the Individual Defendants

violated the Code of Conduct by engaging in insider trading, netting proceeds of approximately

$147.6 million. Also, the Individual Defendants failed to maintain internal controls, failed to obtain

waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to

comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## REGENERON'S AUDIT COMMITTEE CHARTER

107.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*:

> [P]rovide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting and internal control and legal compliance functions of the Corporation, including, without limitation, (a) assisting the Board in its oversight function by monitoring (i) the integrity of the Corporation's financial statements, (ii) the Corporation's compliance with legal and regulatory requirements, (iii) the Corporation's independent auditors' qualifications and independence, and (iv) the performance of the Corporation's independent auditors and the Corporation's internal audit function, if applicable, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Corporation's annual proxy statement.

108.    The Audit Committee Charter, under the heading "Oversight and Evaluation of Internal Audit," states that the responsibilities of the Audit Committee are as follows, *inter alia*:

- Evaluate the internal audit process for establishing the annual audit plan and the focus on risk;

- Evaluate the audit scope and role of internal audit;

- Consider and review with management:

   (i)    The planned scope of the internal audit plan;

   (ii)   The internal audit budget;

   (iii)  Significant findings and management's response including the timetable for implementation to correct weaknesses; and

   (iv)   Any difficulties encountered in the course of the internal audit such as restrictions on the scope of their work or access to information;

109.    The Audit Committee Charter, under the heading "Annual Audit and Quarterly

Reviews," states that the responsibilities of the Audit Committee are as follows, *inter alia*:

- Review and accept, if appropriate, the annual audit plan of the Corporation's independent auditors, including the scope of audit activities and all critical accounting policies and practices to be used, and monitor such plan's progress and results during the year;

- Confirm through private discussions with the Corporation's independent auditors and the Corporation's management that no management restrictions are being placed on the scope of the independent auditors' work and discuss any disagreement between the independent auditors and management;

- Review the results of the year-end audit of the Corporation, including any comments or recommendations of the Corporation's independent auditors;

- Review with management, the Corporation's independent auditors and, if applicable, the Chief Audit Executive, the following:

    (i)   The Corporation's annual audited financial statements and quarterly financial statements, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", and any major issues related thereto;

    (ii)  Critical accounting policies and such other accounting policies of the Corporation as are deemed appropriate for review by the Committee prior to any interim or year-end filings with the SEC or other regulatory body, including any financial reporting issues which could have a material impact on the Corporation's financial statements, as well as any critical audit matters arising from the current period audit;

    (iii) Major issues regarding accounting principles and financial statements, presentations, including (A) any significant changes in the Corporation's selection or application of accounting principles and (B) any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the ramifications and effects of alternative generally accepted accounting principles methods on the Corporation's financial statements;

* * *

- Review with the chief executive officer and chief financial officer and independent auditors, periodically, the following:

33

(i)  Significant deficiencies in the design or operation of internal controls which could adversely affect the Corporation's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Corporation's independent auditors;

(ii)  Fraud that involves management or other employees of the Corporation; and

(iii)  Significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

110.    The Audit Committee Charter, under the heading "Financial Reporting Process and Internal Controls," states that the responsibilities of the Audit Committee are as follows, *inter alia*:

- Review the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures and disclosure procedures through inquiry and discussions with management of the Corporation and the Corporation's independent auditors;

- Review the yearly report prepared by management assessing the effectiveness of the Corporation's internal control structure and procedures for financial reporting and stating management's responsibility to establish and maintain such structure and procedures, prior to its inclusion in the Corporation's annual report;

- Review with management the Corporation's administrative, operational and accounting internal controls, including controls and security of the computerized information systems and any special audit steps adopted in light of material control deficiencies, and evaluate whether the Corporation is operating in accordance with its prescribed policies, procedures and codes of conduct;

- Review with management and the independent auditors any significant deficiencies and material weaknesses, as defined by the Public Company Accounting Oversight Board, affecting internal control.

111.    Lastly, under the heading "Other Matters," the Audit Committee Charter states that the responsibilities of the Audit Committee are to, *inter alia*: "Meet annually with the general

counsel, and outside counsel when appropriate, to review legal and regulatory matters, including any matters that may have a material impact on the financial statements of the Corporation."

112.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in the Credit Card Fee Misconduct, issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

113.    Regeneron is a biotechnology company that designs, develops, produces, and sells medical treatments for, *inter alia*, eye disease, allergic and inflammatory diseases, cardiovascular disease, and cancer.

114.    One of Regeneron's main products is Eylea, which is an injection that is used to treat age-related macular degeneration. Eylea does this by impeding the anti-VEGF. The FDA approved Eylea for use as an anti-VEGF inhibitor in treatment for age-related macular degeneration in November 2011. In August 2023, a high dose version of Eylea, called Eylea HD, was approved by the FDA.

115.    Medicare was established in 1965 to provide health insurance coverage for citizens aged sixty-five or older. CMS administers Medicare through the use of government funding. Medicare consists of four separate parts: A, B, C, and D.

116.    A large portion of Regeneron's revenue is made up of sales of Eylea and Eylea HD, which themselves are largely reliant on reimbursements from third-party payors such as Medicare and Medicaid. These reimbursement rates are based at 106% of the ASP the Company reports to the CMS. ASP is statutorily defined as the "'manufacturer's sales to all purchasers . . . in the United States for such drug or biological in the calendar quarter; divided by [] the total number of such units of such drug or biological sold by the manufacturer in such quarter." 42 U.S.C. § 1395w–3a(c)(1)(A)-(B). When CMS posts a Medicare payment rate, it then sends the rate to Medicare contractors for claims processing, before the next quarter. As such, there is typically a two-quarter lag in between when sales that are reflected in ASP occur and when these sales become the basis for Medicare payment accounts.

**The Credit Card Fee Misconduct**

***The Company is Statutorily Required to Report any Concessions to CMS***

117.    Drug manufacturers are required by CMS to report the ASP of their Part B drugs on a quarterly basis. 42 C.F.R. § 414.804(a)(5).

118.    Medicare Part B mainly covers outpatient procedures and physician-administered prescription drugs, such as Eylea. As such, the Company was required to report Eylea's ASP to CMS each quarter.

119.    In its reporting procedures, CMS requires manufacturers to report the following:

*(2) Price concessions.*

> *(i) In calculating the manufacturer's average sales price, a manufacturer must deduct price concessions. Price concessions include*

> *the following types of transactions and items:*
>
> > *(A) Volume discounts.*
> >
> > *(B) Prompt pay discounts.*
> >
> > *(C) Cash discounts.*
> >
> > *(D) Free goods that are contingent on any purchase requirement.*
> >
> > *(E) Chargebacks and rebates (other than rebates under the Medicaid program).*[1]

42 C.F.R. § 414.804(a)(2).

120.    As such, the Company was required to report its ASP of Eylea to CMS each quarter, as well as report any concessions (such as paying distributors' credit card fees) in the ASP.

### *How Regeneron Distributes Eylea*

121.    The Company received FDA approval for Eylea in 2011. At this time, when the Company launched Eylea, it chose to contract with distributors by selling Eylea to them at wholesale acquisition costs, which were approximately $1,850 per vial, as opposed to selling the drug directly to retina practitioners. Under its agreements with distributors, the Company would pay a fee for services related to the distribution of Eylea, including "Customer Service," "Warehouse and Distribution," "Returns Management," Finance," "Information Technology and Reporting," and "Chargeback Management."

122.    The distributors would then sell Eylea to retina practitioners, with the distributors being responsible for collecting payments. For each unit of Eylea sold by a distributor, the Company would pay that distributor a service fee.

123.    Many of the Company's customers track their spreads on high-cost, buy-and-bill drugs, such as Eylea. Many of the large retina practices will have non-medical "practice

---

[1] All emphasis has been added unless otherwise noted herein.

administrators" who are responsible for tracking the financial status of these practices, as well as tracking the spreads for high cost drugs such as Eylea. As such, the Company brought on a number of practice administrators as consultants and as speakers for Eylea reimbursement-focused dinner events with customers.

124.    Anti-VEGF drugs, including Eylea, often comprise a large portion of a retina practice's total revenues, frequently resulting in revenues as high as tens of millions of dollars per year, with resulting profits equaling millions of dollars per year. As the result of these high revenues, these retina practices have become attractive acquisition targets for private equity firms. As such, many practices base their selection of anti-VEGF drugs on which drug can provide the greatest profit, a fact that the Company was well aware of at all relevant times.

### Regeneron Covered the Credit Card Fees for Eylea Customers

125.    Among the costs and potential profits that customers would track in their spreads was "Credit Card Rebates" or a similar term. This category included amounts customers expected to receive from credit card cash back rewards programs. Due to Eylea's high cost, these cashback programs often resulted in practices receiving hundreds of thousands of dollars in cashback rewards per year. According to the DOJ Complaint, one practice in Massachusetts reported that its total cashback on Eylea purchases in 2019 was $445,044.39.

126.    The DOJ Complaint also alleged that, as the result of the Company's consultations with practice administrators, Regeneron was aware of the benefits its customers received as the result of the cashback programs. Moreover, the Company was aware of the resulting credit card fees distributors would incur for allowing customers to use their credit cards. As a result, in August 2012, Defendant Fenimore, then the Company's Vice President of Financial Planning, requested approval from Defendant Schleifer to pay credit card fee disbursements "so that [the Company]

can efficiently process the fees payable" to distributors. In response, Defendant Schleifer stated that "the suggested approach makes good sense. I approve." Since then, the Company included in its agreements that it would reimburse distributors for credit card processing fees so that those fees were not passed on to customers.

127.    Frequently, the amount of fees paid by the Company to distributors as credit card reimbursements makes up millions of dollars. For example, the DOJ Complaint alleged that, in the first quarter of 2014, the Company paid approximately $5.4 million in credit card fees to its specialty distributors. Those numbers have only grown, with the DOJ Complaint highlighting that, in December 2020, the Company paid $7.5 million to a single distributor for the month of December alone.

128.    In total, between January 2018 and May 2021, the DOJ Complaint alleges the Company paid three of its distributors over $250 million for credit card processing fees. This $250 million in fees is money that was not passed on by distributors to customers, meaning that, by paying these fees, the Company essentially lowered its customers' costs for purchasing Eylea by $250 million during this period.

129.    This type of deal that Regeneron has entered into with distributors has allowed customers to reap the benefits of using credit cards to purchase Eylea while paying a lower cash price from distributors. As such, and as the DOJ Complaint alleges, the Regeneron payments of credit card fees were price concessions, as opposed to bona fide service fees, and were thus required to be included in the ASP figure that the Company reported to CMS.

### *Regeneron Knowingly Did Not Include the Credit Card Service Fees as Concessions on its ASP Reports*

130.    CMS guidelines state that payments that lower a customer's costs are price concessions when they are not bona fide service fees. The regulatory definition of a bona fide

service fee is a fee that meets the following criteria: (1) a fee paid by manufacturers to an entity that represents the fair market value; (2) for a bona fide, itemized service that was actually performed on behalf of the manufacturer; (3) that the manufacturer would have otherwise performed (or contracted for) in the absence of the service arrangement; and (4) that is not passed on in whole or in part to a client or customer of an entity. 42 C.F.R. § 414.802.

131.     However, the credit card fees paid for by Regeneron were not bona fide service fees, as there was no bona fide service being performed. Instead, the Company was paying credit card service fees to distributors as fees separate from those that they paid for distribution services. This was done as a means to avoid having the distributors charge customers more to cover the cost of the fees, effectively lowering the cost of Eylea for customers. The credit card fees were also not considered bona fide service fees since the Company's distributors would still distribute Eylea even in the absence of the credit card fee payments. Were the Company to stop covering the cost of credit card service fees, distributors would simply charge the customers the service fees instead. Thus, Regeneron knew that if it could reimburse distributors for these service fees, its customers would be able to buy Eylea at a lower price than the Company's competitors, thereby increasing demand.

132.     Still, according to the DOJ Complaint, in an internal document from April 2016, the Company decided that credit card fees it was paying did in fact meet the definition of bona fide service fees.

133.     The Company also had an incentive to not report these fees to CMS. A drug's ASP is used by CMS to calculate the reimbursement rates physicians receive when they purchase these products. As such, a drug with a higher ASP will result in physicians (who are the Company's clients) receiving higher reimbursement rates when using those drugs. Alternatively, a concession

which results in a lower ASP will result in physicians receiving lower reimbursement rates for using a certain drug. Further, when a Company's ASP is consistent, the reimbursements going to physicians will typically be consistent as well, meaning physicians have a greater incentive to prescribe treatments that have consistent reimbursement rates, as the physicians will know in advance what reimbursement they will receive. As such, a stable (and high) ASP will incentivize physicians to continue using a company's drug over that of its competitors.

134.    The Company was aware that if it were to correctly report the credit card service fees it was reimbursing distributors as price concessions, it would lower Eylea's ASP, resulting in a lower and less stable reimbursement rate. This gave the Company further motivation not to report the credit card service fees.

135.    At all relevant times, the Company submitted its quarterly ASP reports to CMS for Eylea. Notably, and in violation of the False Claims Act, these reports did not contain deductions for the aforementioned credit card fee payments, or any portion thereof, as concessions between 2012 and 2023.

136.    As a result, the reimbursement rates set by CMS under Medicare Part B were significantly inflated for Eylea. In sum, by failing to report the credit card fee payments it was making that constituted subsidies to physicians, the Company was reporting a higher ASP to CMS, who in turn awarded these same physicians higher reimbursement rates when using Eylea.

137.    As such, the Company's failure to properly report the credit card service fee reimbursements caused the government to reimburse providers hundreds of millions of dollars in false claims under Medicare in violation of the False Claims Act.

**<u>False and Misleading Statements</u>**

***November 2, 2023 Press Release***

41

138.    On November 2, 2023, the Company issued a press release announcing its financial results for the third quarter of the 2023 Fiscal Year ("Q3 2023") (the "Q3 2023 Earnings Release"). In the Q3 2023 Earnings Release, the Company reported that "[t]hird quarter 2023 revenues increased 15% to $3.36 billion versus third quarter 2022," which was purportedly in large part due to growing sales of Eylea and Eylea HD. Indeed, the Q3 2023 Earnings Release announced that "U.S. net sales for EYLEA and EYLEA HD were $1.49 billion, including $43 million from EYLEA HD." In particular, the Q3 2023 Earnings Release revealed the following, in relevant part:

Third quarter 2023 revenues increased 15% to $3.36 billion versus third quarter 2022

* * *

Third quarter 2023 U.S. net sales for EYLEA® and EYLEA HD were $1.49 billion, including $43 million from EYLEA HD

* * *

Third quarter 2023 GAAP diluted EPS of $8.89 and non-GAAP diluted EPS(a) of $11.59; includes unfavorable $0.77 impact from acquired IPR&D charge

* * *

| ($ in millions, except per share data) | | Q3 2023 | | Q3 2022 | % Change |
|---|---|---|---|---|---|
| Total revenues | $ | 3,363 | $ | 2,936 | 15 % |
| GAAP net income | $ | 1,008 | $ | 1,316 | (23 %) |
| GAAP net income per share - diluted | $ | 8.89 | $ | 11.66 | (24 %) |
| Non-GAAP net income(a) | $ | 1,329 | $ | 1,270 | 5 % |
| Non-GAAP net income per share - diluted(a) | $ | 11.59 | $ | 11.14 | 4 % |

* * *

| ($ in millions) | Q3 2023 | Q3 2022 | % Change |
|---|---|---|---|
| Net product sales: | | | |
| EYLEA - U.S. | $  1,448 | $  1,629 | (11 %) |
| EYLEA HD - U.S. | 43 | — | * |
| Libtayo - Global** | 232 | 126 | 84 % |
| Praluent® - U.S. | 40 | 30 | 33 % |
| Evkeeza® - U.S. | 19 | 13 | 46 % |
| Inmazeb® - U.S. | 4 | 3 | 33 % |
| Total net product sales | 1,786 | 1,801 | (1 %) |
| Collaboration revenue: | | | |
| Sanofi | 1,065 | 711 | 50 % |
| Bayer | 377 | 333 | 13 % |
| Other | (3) | 6 | * |
| Other revenue | 138 | 85 | 62 % |
| Total revenues | $  3,363 | $  2,936 | 15 % |

*November 2, 2023 10-Q*

139.    That same day, the Company filed its quarterly report with the SEC on Form 10-Q for Q3 2023 (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendant Landry and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Schleifer and Landry attesting to the accuracy of the Q3 2023 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

140.    With regard to the Company's risk assessments, the Q3 2023 10-Q provided the following discussion, which notably downplayed any risks arising out of violations of the False Claims Act and characterized them as purely hypothetical:

> *Our business activities have been, and may in the future be, challenged under U.S. federal or state and foreign healthcare laws, which may subject us to civil or criminal proceedings, investigations, or penalties.*[2]

\* \* \*

In addition to FDA and related regulatory requirements, we are subject to health

---

[2] Unless otherwise noted, all emphasis is added.

care "fraud and abuse" laws, such as the federal civil False Claims Act, the anti-kickback provisions of the federal Social Security Act, and other state and federal laws and regulations.

* * *

The federal civil False Claims Act prohibits any person from, among other things, knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, or causing to be made, a false statement to get a false claim paid.

* * *

***Pharmaceutical companies have been investigated and/or prosecuted under these laws for a variety of alleged promotional and marketing activities, such as allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product; reporting to pricing services inflated average wholesale prices that were then used by federal programs to set reimbursement rates; engaging in promotion for uses that the FDA has not approved, known as off-label uses, that caused claims to be submitted to Medicaid for non-covered off-label uses; and submitting inflated best price information to the Medicaid Rebate program.***

* * *

We continue to dedicate significant resources to comply with these requirements and need to be prepared to comply with additional reporting obligations outside the United States.

* * *

If we are found not to be in full compliance with these laws, we could face enforcement actions, fines, and other penalties, and could receive adverse publicity, which would harm our business, prospects, operating results, and financial condition. Additionally, access to such data by fraud-and-abuse investigators and industry critics may draw scrutiny to our collaborations with reported entities.

141.    Regarding risks related to Regeneron's noncompliance with reporting obligations under governmental pricing and reimbursement programs, the Q3 2023 10-Q contains the following disclosure:

***If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions***

*and fines, which could have a material adverse effect on our business, financial condition, results of operations, and future prospects.*

\* \* \*

We have obligations to report the average sales price for certain of our drugs to the Medicare program. Statutory or regulatory changes or CMS guidance could affect the average sales price calculations for our products and the resulting Medicare payment rate, and could negatively impact our results of operations.

Starting in 2023, manufacturers must pay refunds to Medicare for single-source drugs or biological products, or biosimilar biological products, reimbursed under Medicare Part B and packaged in single-dose containers or single-use packages for units of discarded drug reimbursed by Medicare Part B in excess of 10 percent of total allowed charges under Medicare Part B for that drug. Manufacturers that fail to pay refunds could be subject to civil monetary penalties of 125 percent of the refund amount.

Pursuant to applicable law, knowing provision of false information in connection with price reporting or contract-based requirements under the VA/FSS and/or Tricare programs can subject a manufacturer to civil monetary penalties. These program and contract-based obligations also contain extensive disclosure and certification requirements. If we overcharge the government in connection with our arrangements with FSS or Tricare, we are required to refund the difference to the government. Failure to make necessary disclosures or to identify contract overcharges can result in allegations against us under the False Claims Act and other laws and regulations. Unexpected refunds to the government, and/or response to a government investigation or enforcement action, would be expensive and time-consuming, and could have a material adverse effect on our business, financial condition, results of operations, and future prospects.

### January 8, 2024 J.P. Morgan Conference

142.    On January 8, 2024, Defendant Schleifer represented the Company in a presentation at the 42nd Annual J.P. Morgan Healthcare Conference (the "J.P. Morgan Presentation"). During the J.P. Morgan Presentation, Defendant Schleifer reported, *inter alia*, preliminary fourth quarter results for the 2023 Fiscal Year for Eylea and Eylea HD. Among these results, Defendant Schleifer represented that in the fourth quarter, Eylea and Eylea HD combined had "U.S. net product sales of $1.34 billion." Of that amount, Eylea HD alone purportedly had $123 million in fourth quarter net product sales in the United States, which Eylea HD had allegedly

managed to "achieve[] in first full quarter following launch." The J.P. Morgan presentation also highlighted a number of updates pertaining to Eylea and Eylea HD, namely:

- FDA approval for wAMD, DME and DR received in August 2023

- Early indicators suggest broad initial uptake across treatment landscape

- Strong 2-year data from pivotal PULSAR and PHOTON studies presented in 2H 2023, supporting best-in-class efficacy, safety, and durability profile

- ~2/3 of eligible lives have coverage; vast majority of covered lives have first-line or single-step-edit access to Eylea HD

- ***100% of Medicare jurisdictions have confirmed paid claims***

- Remain on track for permanent J-Code on April 1, 2024

***February 2, 2024 Press Release***

143.    On February 2, 2024, the Company issued a press release announcing its fourth quarter and year-end financial results for the 2023 Fiscal Year (the "FY 2023 Earnings Release"). The FY 2023 Earnings Release represented that Regeneron's "[f]ull year 2023 revenues increased 8% to $13.12 billion versus full year 2022." The FY 2023 Earnings Release also confirmed the fourth quarter results for Eylea and Eylea HD that had been reported during the J.P. Morgan Presentation. Additionally, the FY 2023 Earnings Release reported that net sales for Eylea and Eylea HD in the United States totaled $5.89 billion for the 2023 Fiscal Year, with Eylea HD allegedly comprising $166 million of this amount after receiving FDA approval in August 2023.

144.    In particular, the FY 2023 Earnings Release stated the following, in relevant part:

***Fourth quarter 2023 revenues increased 1% to $3.43 billion versus fourth quarter 2022; excluding RonapreveTM(a)(b), revenues increased 14%***

***Full year 2023 revenues increased 8% to $13.12 billion versus full year 2022; excluding Ronapreve(a), revenues increased 12%***

\* \* \*

46

*Fourth quarter 2023 U.S. net sales for EYLEA® HD and EYLEA® were $1.46 billion, including $123 million from EYLEA HD; full year 2023 U.S. net sales for EYLEA HD and EYLEA were $5.89 billion, including $166 million from EYLEA HD following its August 2023 FDA approval*

\* \* \*

| ($ in millions, except per share data) | Three Months Ended December 31, | | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2023 | 2022 | % Change | 2023 | 2022 | % Change |
| Total revenues | $ 3,434 | $ 3,414 | 1 % | $ 13,117 | $ 12,173 | 8 % |
| Total revenues excluding Ronapreve[(a)(b)] | $ 3,436 | $ 3,018 | 14% | $ 12,906 | $ 11,546 | 12% |
| GAAP net income | $ 1,160 | $ 1,197 | (3 %) | $ 3,954 | $ 4,338 | (9 %) |
| GAAP net income per share - diluted | $ 10.19 | $ 10.50 | (3 %) | $ 34.77 | $ 38.22 | (9 %) |
| Non-GAAP net income[(a)] | $ 1,366 | $ 1,449 | (6 %) | $ 5,045 | $ 5,164 | (2 %) |
| Non-GAAP net income per share - diluted[(a)] | $ 11.86 | $ 12.56 | (6 %) | $ 43.79 | $ 44.98 | (3 %) |

\* \* \*

| ($ in millions) | Q4 2023 | Q4 2022 | % Change | FY 2023 | FY 2022 | % Change |
|---|---|---|---|---|---|---|
| Net product sales: | | | | | | |
| EYLEA HD - U.S. | $ 123 | $ — | * | $ 166 | $ — | * |
| EYLEA - U.S. | 1,338 | 1,496 | (11 %) | 5,720 | 6,265 | (9 %) |
| Total EYLEA HD and EYLEA - U.S. | 1,461 | 1,496 | (2 %) | 5,886 | 6,265 | (6 %) |
| Libtayo - Global** | 244 | 152 | 61 % | 863 | 448 | 93 % |
| Praluent® - U.S. | 61 | 36 | 69 % | 182 | 130 | 40 % |
| Evkeeza - U.S. | 24 | 15 | 60 % | 77 | 48 | 60 % |
| Inmazeb® - U.S. | 62 | — | * | 70 | 3 | * |
| Total net product sales | 1,852 | 1,699 | 9 % | 7,078 | 6,894 | 3 % |
| Collaboration revenue: | | | | | | |
| Sanofi | 993 | 836 | 19 % | 3,800 | 2,856 | 33 % |
| Bayer | 377 | 355 | 6 % | 1,487 | 1,431 | 4 % |
| Other | — | 396 | (100 %) | 216 | 627 | (66 %) |
| Other revenue | 212 | 128 | 66 % | 536 | 365 | 47 % |
| Total revenues | $ 3,434 | $ 3,414 | 1 % | $ 13,117 | $ 12,173 | 8 % |

*February 5, 2024 10-K*

145.     On February 5, 2024, the Company filed with the SEC on Form 10-K its annual financial and operational results for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants Schleifer, Landry, Fenimore, Yancopoulos, Bassler, Brown, Coles, Goldstein, Guarini, Poon, Ryan, Schenkein, Sing, Thompson, and Zoghbi and attached SOX certifications signed by Defendants Schleifer and Landry attesting to the accuracy of the 2023 10-K and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

146.     The 2023 10-K contained risk disclosures for risks related to non-compliance with

the False Claims Act and reporting obligations that were substantially similar to those found in the

Q3 2023 10-Q. In particular, the 2023 10-K stated:

> ***Our business activities have been, and may in the future be, challenged under U.S. federal or state and foreign healthcare laws, which may subject us to civil or criminal proceedings, investigations, or penalties.***
>
> * * *
>
> In addition to FDA and related regulatory requirements, we are subject to health care "fraud and abuse" laws, such as the federal civil False Claims Act, the antikickback provisions of the federal Social Security Act, and other state and federal laws and regulations.
>
> * * *
>
> The federal civil False Claims Act prohibits any person from, among other things, knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, or causing to be made, a false statement to get a false claim paid.
>
> * * *
>
> ***Pharmaceutical companies have been investigated and/or prosecuted under these laws for a variety of alleged promotional and marketing activities, such as allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product; reporting to pricing services inflated average wholesale prices that were then used by federal programs to set reimbursement rates; engaging in promotion for uses that the FDA has not approved, known as off-label uses, that caused claims to be submitted to Medicaid for non-covered off-label uses; and submitting inflated best price information to the Medicaid Rebate program.***
>
> * * *
>
> We continue to dedicate significant resources to comply with these requirements and need to be prepared to comply with additional reporting obligations outside the United States.
>
> * * *
>
> If we are found not to be in full compliance with these laws, we could face enforcement actions, fines, and other penalties, and could receive adverse publicity, which would harm our business, prospects, operating results, and financial condition. Additionally, access to such data by fraud-and-abuse investigators and industry critics may draw scrutiny to our collaborations with reported entities.

147.    In addition, regarding risks related to Regeneron's noncompliance with reporting

obligations under governmental pricing and reimbursement programs, the 2023 10-K contained

substantially the same representations as the Q3 2023 10-Q, stating the following, in relevant part:

*If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions and fines, which could have a material adverse effect on our business, financial condition, results of operations, and future prospects.*

\* \* \*

We have obligations to report the average sales price for certain of our drugs to the Medicare program. Statutory or regulatory changes or CMS guidance could affect the average sales price calculations for our products and the resulting Medicare payment rate, and could negatively impact our results of operations.

Manufacturers must pay refunds to Medicare for single-source drugs or biological products, or biosimilar biological products, reimbursed under Medicare Part B and packaged in single-dose containers or single-use packages for units of discarded drug reimbursed by Medicare Part B in excess of 10 percent of total allowed charges under Medicare Part B for that drug. Manufacturers that fail to pay refunds could be subject to civil monetary penalties of 125 percent of the refund amount.

Pursuant to applicable law, knowing provision of false information in connection with price reporting or contract-based requirements under the VA/FSS and/or Tricare programs can subject a manufacturer to civil monetary penalties. These program and contract-based obligations also contain extensive disclosure and certification requirements. If we overcharge the government in connection with our arrangements with FSS or Tricare, we are required to refund the difference to the government. Failure to make necessary disclosures or to identify contract overcharges can result in allegations against us under the False Claims Act and other laws and regulations. Unexpected refunds to the government, and/or response to a government investigation or enforcement action, would be expensive and time consuming, and could have a material adverse effect on our business, financial condition, results of operations, and future prospects.

148.    The statements in paragraphs ¶¶138-147 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company paid credit card fees to distributors so those distributors would not charge Eylea customers extra for use of a credit card; (2) these payments were considered a subsidy for customer purchases of Eylea which ultimately lowered the price of the product; (3) by not reporting these payments, the Company reported a higher ASP than Eylea actually had to federal agencies in

violation of the False Claims Act; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins To Emerge As The False And Misleading Statements Continue**

*April 10, 2024 DOJ Announcement*

149.    The truth began to emerge on April 10, 2024 when the DOJ revealed it had filed a complaint against Regeneron due to violations of the False Claims Act. Namely, the DOJ alleged that the Company neglected to report millions of dollars in discounts it had previously provided to distributors of Eylea as reimbursed credit card fees. Due to the foregoing, the DOJ alleged that Eylea's average selling price was inflated, resulting in improperly increased Medicare reimbursements. In particular, the DOJ Complaint stated:

> Regeneron knew that distributors incurred processing fees if retina practices used credit cards to purchase expensive drugs like Eylea, and that, accordingly, distributors would charge retina practices a higher amount to use credit cards for Eylea purchases, unless Regeneron reimbursed those fees. Regeneron also knew that most customers wanted to use credit cards for their expensive drug purchases, in part because of the lucrative cash back rewards. ***Regeneron thus agreed to, and did pay, the credit card processing fees for retina practices' Eylea purchases.***
>
> * * *
>
> An unwritten, but well-understood and followed, component of Regeneron's agreements with distributors was that Regeneron paid credit card processing fees for customers' Eylea purchases on the condition that the distributors did not charge Eylea customers more to use a credit card—which Regeneron knew they otherwise would in the absence of Regeneron's payments.
>
> * * *
>
> ***Before and after Eylea's launch, Regeneron understood the competitive nature of the Wet AMD market, including that retina practices were sensitive to the higher prices they faced when they used credit cards to purchase Anti-VEGF medications.*** In July 2011, a Regeneron "Reimbursement Business Manager" sent an internal email describing this dynamic and noting that it was a "big deal" for certain customers to be able to use credit cards without incurring an additional expense: "Lucentis [D]irect does not charge the providers any more for paying with a credit card, however ***the distributors (Besse) do charge more for a credit card payment. This also was a big deal for several accounts.***" Ex. 28 (emphasis added). Robert Davis, then Regeneron's Senior Director of Trade, Reimbursement and

Managed Markets, responded "Good feedback and pretty consistent . . . . *We will pay pass thru fees so the 3 distributors [(Besse, McKesson, and CuraScript)] will not charge extra to offices." Id.* (emphasis added).

Regeneron marketed to customers that they could use credit cards to purchase Eylea from distributors without paying more—and that customers could not do so for Lucentis— as a "Key Takeaway" in its messaging:

## Key Takeaways:

- EYLEA is contracted with three distributors
- Credit cards are accepted by all 3 distributors and <u>not</u> for Lucentis orders

\* \* \*

*Thus, Regeneron's reimbursement of credit card fees was functionally no different than if Regeneron or distributors directly paid customers to cover the higher costs they would otherwise have incurred, or if distributors credited customers for those amounts on their invoices, based on Regeneron's payments.* Regeneron knew its payments were passed on to customers in two ways: (1) the lower, subsidized prices customers paid when they used credit cards to purchase Eylea from distributors, and (2) the "cash back" and credit card rewards Eylea customers received from those purchases.

\* \* \*

*By purporting not to offer price concessions on Eylea, Regeneron could market Eylea's stable ASP (and stable reimbursement) as a competitive advantage for retina practices when compared to Lucentis.*

\* \* \*

*Regeneron knew that its payment of credit card processing fees on behalf of customers was a price concession for many customers, and because Regeneron did not report them as price concessions, had the further benefit of not eroding Eylea's ASP.*

150.    On this news, the price of the Company's common stock fell $31.50 per share over two trading days, or approximately 3.36%, from a closing price of $936.20 per share on April 10, 2024, to a closing price of $904.70 per share on April 12, 2024. However, the Individual Defendants continued to obfuscate the truth about Eylea's inflated average selling price and the resulting inappropriately increased Medicare reimbursements.

51

*2024 Proxy Statement*

151.    On April 25, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Schleifer, Bassler, Brown, Coles, Goldstein, Guarini, Poon, Ryan, Schenkein, Sing, Thompson, Yancopoulos, and Zoghbi solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

152.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

153.    Regarding "Board Oversight of Risk and Key Pricing Decisions," the 2024 Proxy Statement stated the following, in relevant part:

- The board receives detailed regular reports from members of our senior management that include discussions of the risks and exposures involved in their respective areas of responsibility. Further, the board is routinely informed by the appropriate members of senior management of developments internal and external to the Company that could affect our risk profile.

- The board considers specific risk topics, including risks associated with our strategic plan, drug access and pricing (discussed further below), our finances, and our development activities. Specific risk topics may also be considered at executive sessions of independent directors, which are chaired by our Lead Independent Director.

  - The board is closely involved in and provides oversight of all key pricing determinations for our products, which we endeavor to make in a thoughtful and well-informed manner with fairness and affordability in mind.

  - We believe we have the appropriate governance mechanisms and internal processes in place to ensure that pricing decisions are thoroughly and appropriately vetted prior to implementation and are made in line with our values and commitments. This includes

> routine presentations to our board of directors or the appropriate committees thereof on drug pricing strategies, practices, and trends. See "The Company—Corporate Governance—Corporate Responsibility" for more information.

- As shown below, the board has delegated certain risk oversight responsibilities to its committees. The board is kept abreast of its committees' risk oversight and other activities via reports of the committee chairs to the full board at regular board meetings.

154.     Regarding the Code of Conduct, the 2024 Proxy Statement stated the following, in relevant part:

> The board of directors has adopted a code of business conduct and ethics that applies to all of our employees, officers, and directors. You can find links to this code on our website at **www.regeneron.com** under the "Corporate Governance" heading on the "Investors & Media" page. We may satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding an amendment to, or a waiver from, a provision of our code of business conduct and ethics that applies to our principal executive officer, principal financial officer, principal accounting officer, or controller, or persons performing similar functions, by posting such information on our website where it is accessible through the same link noted above.

155.     Defendants Schleifer, Bassler, Brown, Coles, Goldstein, Guarini, Poon, Ryan, Schenkein, Sing, Thompson, Yancopoulos, and Zoghbi caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company paid credit card fees to distributors so those distributors would not charge Eylea customers extra for use of a credit card; (2) these payments were considered a subsidy for customer purchases of Eylea which ultimately lowered the price of the product; (3) by not reporting these payments, the Company reported a higher ASP than Eylea actually had to federal agencies in violation of the False Claims Act; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

156.     The 2024 Proxy Statement was also materially false and misleading because,

despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

157.    As a result of Defendants Schleifer, Bassler, Brown, Coles, Goldstein, Guarini, Poon, Ryan, Schenkein, Sing, Thompson, Yancopoulos, and Zoghbi causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve named executive officer compensation on an advisory, non-binding basis.

### May 2, 2024 Press Release

158.    On May 2, 2024, the Company issued a press release announcing its financial and operational results for the first quarter of the 2024 Fiscal Year (the "Q1 2024 Earnings Release"). The Q1 2024 Earnings Release disclosed that the combined net sales for the first quarter within the United States for Eylea and Eylea HD were $1.4 billion, $200 million of which was from Eylea HD. Additionally, Company revenues in the first quarter were purportedly $3.15 billion, representing a 1% decrease year-over-year. However, excluding Ronapreve TM, revenues increase 7% year-over-year.

159.    In relevant part, the Q1 2024 Earnings Release stated:

First quarter 2024 revenues decreased 1% to $3.15 billion versus first quarter 2023; excluding RonapreveTM[], *revenues increased 7%*

\* \* \*

***First quarter 2024 U.S. net sales for EYLEA® HD and EYLEA® were $1.40 billion, including $200 million from EYLEA HD***

\* \* \*

First quarter 2024 GAAP diluted EPS of $6.27 and non-GAAP diluted EPS(a) of $9.55

\* \* \*

| ($ in millions, except per share data) | | Q1 2024 | | Q1 2023 | % Change |
|---|---|---|---|---|---|
| Total revenues | $ | 3,145 | $ | 3,162 | (1 %) |
| Total revenues excluding Ronapreve(a)(b) | $ | 3,145 | $ | 2,940 | 7 % |
| GAAP net income | $ | 722 | $ | 818 | (12 %) |
| GAAP net income per share - diluted | $ | 6.27 | $ | 7.17 | (13 %) |
| Non-GAAP net income(a) | $ | 1,116 | $ | 1,168 | (4 %) |
| Non-GAAP net income per share - diluted(a) | $ | 9.55 | $ | 10.09 | (5 %) |

\* \* \*

| ($ in millions) | | Q1 2024 | | Q1 2023 | % Change |
|---|---|---|---|---|---|
| Net product sales: | | | | | |
| EYLEA HD - U.S. | $ | 200 | $ | — | * |
| EYLEA - U.S. | | 1,202 | | 1,434 | (16 %) |
| Total EYLEA HD and EYLEA - U.S. | | 1,402 | | 1,434 | (2 %) |
| Libtayo - Global | | 264 | | 177 | 49 % |
| Praluent - U.S. | | 70 | | 40 | 75 % |
| Evkeeza® - U.S. | | 24 | | 15 | 60 % |
| Inmazeb® - Global | | 1 | | 2 | * |
| Total net product sales | | 1,761 | | 1,668 | 6 % |
| Collaboration revenue: | | | | | |
| Sanofi | | 910 | | 798 | 14 % |
| Bayer | | 356 | | 357 | — % |
| Other | | 1 | | 223 | (100 %) |
| Other revenue | | 117 | | 116 | 1 % |
| Total revenues | $ | 3,145 | $ | 3,162 | (1 %) |

**May 2, 2024 10-Q**

160.    That same day, the Company filed with the SEC on Form 10-Q its quarterly financial and operational results for the period ended March 31, 2024 (the "Q1 2024 10-Q"). The

Q1 2024 10-Q was signed by Defendant Fenimore and attached SOX certifications signed by

Defendants Schleifer and Fenimore attesting to the accuracy of the Q1 2024 10-Q and that "this

report does not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements

were made, not misleading with respect to the period covered by this report."

161.    In providing risk disclosures pertaining to noncompliance with the False Claims

Act, the Q1 2024 10-Q issued a largely similar risk disclosure as was used in the Q3 2023 10-Q

and the 2023 10-K, stating the following, in relevant part:

> ***Our business activities have been, and may in the future be, challenged under U.S. federal or state and foreign healthcare laws, which may subject us to civil or criminal proceedings, investigations, or penalties.***
> \* \* \*
> In addition to FDA and related regulatory requirements, we are subject to healthcare "fraud and abuse" laws, such as the federal civil False Claims Act, the anti-kickback provisions of the federal Social Security Act, and other state and federal laws and regulations.
> \* \* \*
> The federal civil False Claims Act prohibits any person from, among other things, knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, or causing to be made, a false statement to get a false claim paid.
> \* \* \*
> ***Pharmaceutical companies have been investigated and/or prosecuted under these laws for a variety of alleged promotional and marketing activities, such as allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product; reporting to pricing services inflated average wholesale prices that were then used by federal programs to set reimbursement rates; engaging in promotion for uses that the FDA has not approved, known as off-label uses, that caused claims to be submitted to Medicaid for non-covered off-label uses; and submitting inflated best price information to the Medicaid Rebate program.***
> \* \* \*
> We continue to dedicate significant resources to comply with these requirements and need to be prepared to comply with additional reporting obligations outside the United States.
> \* \* \*
> If we are found not to be in full compliance with these laws, we could face enforcement actions, fines, and other penalties, and could receive adverse publicity,

which would harm our business, prospects, operating results, and financial condition. Additionally, access to such data by fraud-and-abuse investigators and industry critics may draw scrutiny to our collaborations with reported entities.

162.    In providing a risk disclosure pertaining to noncompliance with the Company's

governmental reporting and payment obligations, the Q1 2024 10-Q state the following, in relevant

part:

> ***If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions and fines, which could have a material adverse effect on our business, financial condition, results of operations, and future prospects.***
>
> \* \* \*
>
> We have obligations to report the average sales price for certain of our drugs to the Medicare program. Statutory or regulatory changes or CMS guidance could affect the average sales price calculations for our products and the resulting Medicare payment rate, and could negatively impact our results of operations.
>
> Pursuant to applicable law, knowing provision of false information in connection with price reporting or contract-based requirements under the VA/FSS and/or Tricare programs can subject a manufacturer to civil monetary penalties. These program and contract-based obligations also contain extensive disclosure and certification requirements. If we overcharge the government in connection with our arrangements with FSS or Tricare, we are required to refund the difference to the government. Failure to make necessary disclosures or to identify contract overcharges can result in allegations against us under the False Claims Act and other laws and regulations. Unexpected refunds to the government, and/or response to a government investigation or enforcement action, would be expensive and time-consuming, and could have a material adverse effect on our business, financial condition, results of operations, and future prospects.

### August 1, 2024 Press Release

163.    On August 1, 2024, the Company issued a press release revealing the Company's

financial results for the second quarter of the 2024 Fiscal Year (the "Q2 2024 Earnings Release").

The Q2 2024 Earnings Release represented that, in the second quarter, "revenues increased 12%

to $3.55 billion" which was purportedly supported in large part by sales of Eylea and Eylea HD.

The Q2 2024 Earnings Release reported that "U.S. net sales for EYLEA® HD and EYLEA® increased 2% to $1.53 billion versus second quarter 2023, including $304 million from EYLEA HD." Specifically, the Q2 2024 Earnings Release revealed, in relevant part:

***Second quarter 2024 revenues increased 12% to $3.55 billion versus second quarter 2023***

\* \* \*

***Second quarter 2024 U.S. net sales for EYLEA® HD and EYLEA® increased 2% to $1.53 billion versus second quarter 2023, including $304 million from EYLEA HD***

\* \* \*

Second quarter 2024 GAAP diluted EPS increased 46% to $12.41 and non-GAAP diluted EPS(a) increased 13% to $11.56 versus second quarter 2023

\* \* \*

| ($ in millions, except per share data) | Q2 2024 | | Q2 2023 | | % Change |
|---|---|---|---|---|---|
| Total revenues | $ | 3,547 | $ | 3,158 | 12 % |
| GAAP net income | $ | 1,432 | $ | 968 | 48 % |
| GAAP net income per share - diluted | $ | 12.41 | $ | 8.50 | 46 % |
| Non-GAAP net income(a) | $ | 1,351 | $ | 1,182 | 14 % |
| Non-GAAP net income per share - diluted(a) | $ | 11.56 | $ | 10.24 | 13 % |

\* \* \*

58

| ($ in millions) | Q2 2024 | Q2 2023 | % Change |
|---|---|---|---|
| **Net product sales:** | | | |
| EYLEA HD - U.S. | $   304 | $    — | * |
| EYLEA - U.S. | 1,231 | 1,500 | (18 %) |
| Total EYLEA HD and EYLEA - U.S. | 1,535 | 1,500 | 2 % |
| Libtayo - Global | 297 | 210 | 41 % |
| Praluent - U.S. | 56 | 41 | 37 % |
| Evkeeza® - U.S. | 31 | 19 | 63 % |
| Inmazeb® - Global | — | 2 | (100 %) |
| Total net product sales | 1,919 | 1,772 | 8 % |
| **Collaboration revenue:** | | | |
| Sanofi | 1,146 | 944 | 21 % |
| Bayer | 375 | 377 | (1 %) |
| Other | 3 | (4) | * |
| Other revenue | 104 | 69 | 51 % |
| Total revenues | $  3,547 | $  3,158 | 12 % |

***Total EYLEA HD and EYLEA net product sales in the U.S. increased 2% in the second quarter of 2024 compared to the second quarter of 2023. EYLEA HD was approved by the FDA in August 2023 and EYLEA HD net product sales in the second quarter of 2024 were driven by the transition of patients from other anti-VEGF products, including EYLEA, to EYLEA HD, as well as new patients naïve to anti-VEGF therapy.***

***August 1, 2024 10-Q***

164.    That same day, the Company filed with the SEC on Form 10-Q its quarterly financial and operational results for the period ended June 30, 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendant Fenimore and attached SOX certifications signed by Defendants Schleifer and Fenimore attesting to the accuracy of the Q2 2024 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

165.    In providing risk disclosures pertaining to noncompliance with the False Claims Act, the Q2 2024 10-Q issued a largely similar risk disclosure as was used in the Q3 2023 10-Q, the 2023 10-K, and the Q1 2024 10-Q, stating the following, in relevant part:

***Our business activities have been, and may in the future be, challenged under U.S. federal or state and foreign healthcare laws, which may subject us to civil or criminal proceedings, investigations, or penalties.***

\* \* \*

In addition to FDA and related regulatory requirements, we are subject to healthcare "fraud and abuse" laws, such as the federal civil False Claims Act, the anti-kickback provisions of the federal Social Security Act, and other state and federal laws and regulations.

\* \* \*

The federal civil False Claims Act prohibits any person from, among other things, knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, or causing to be made, a false statement to get a false claim paid.

\* \* \*

***Pharmaceutical companies have been investigated and/or prosecuted under these laws for a variety of alleged promotional and marketing activities, such as allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product; reporting to pricing services inflated average wholesale prices that were then used by federal programs to set reimbursement rates; engaging in promotion for uses that the FDA has not approved, known as off-label uses, that caused claims to be submitted to Medicaid for non-covered off-label uses; and submitting inflated best price information to the Medicaid Rebate program.***

\* \* \*

We continue to dedicate significant resources to comply with these requirements and need to be prepared to comply with additional reporting obligations outside the United States.

\* \* \*

If we are found not to be in full compliance with these laws, we could face enforcement actions, fines, and other penalties, and could receive adverse publicity, which would harm our business, prospects, operating results, and financial condition. Additionally, access to such data by fraud-and-abuse investigators and industry critics may draw scrutiny to our collaborations with reported entities.

166.    Additionally, the risk disclosures that pertained to the Company's reporting obligations under governmental pricing and reimbursement programs were largely similar to the risk disclosures in the Q1 2024 10-Q and stated the following, in relevant part:

***If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions and fines, which could have a material adverse effect on our business, financial condition, results of operations, and future prospects.***

60

* * *

We have obligations to report the average sales price for certain of our drugs to the Medicare program. Statutory or regulatory changes or CMS guidance could affect the average sales price calculations for our products and the resulting Medicare payment rate, and could negatively impact our results of operations.

Pursuant to applicable law, knowing provision of false information in connection with price reporting or contract-based requirements under the VA/FSS and/or Tricare programs can subject a manufacturer to civil monetary penalties. These program and contract-based obligations also contain extensive disclosure and certification requirements. If we overcharge the government in connection with our arrangements with FSS or Tricare, we are required to refund the difference to the government. Failure to make necessary disclosures or to identify contract overcharges can result in allegations against us under the False Claims Act and other laws and regulations. Unexpected refunds to the government, and/or response to a government investigation or enforcement action, would be expensive and time consuming, and could have a material adverse effect on our business, financial condition, results of operations, and future prospects.

167.    The statements in ¶¶158-166 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company paid credit card fees to distributors so those distributors would not charge Eylea customers extra for use of a credit card; (2) these payments were considered a subsidy for customer purchases of Eylea which ultimately lowered the price of the product; (3) by not reporting these payments, the Company reported a higher ASP than Eylea actually had to federal agencies in violation of the False Claims Act; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times

## THE TRUTH FULLY EMERGES

### *October 31, 2024 Press Release*

168.    The truth fully emerged on October 31, 2024 when the Company issued the Q3 2024 Earnings Release, revealing its financial outcomes for the third quarter of the 2024 Fiscal Year.

169.    The Q3 2024 Earnings Release revealed disappointing results for the third quarter.

Namely, the Q3 2024 Earnings Release revealed that net sales for Eylea and Eylea HD in the United States were $1.54 billion, only a 3% increase year-over-year. Additionally, $392 million of those quartlerly sales reportedly came from Eylea HD, meaning that net sales for Eylea had actually fallen 21% year-over-year and missed consensus estimates of $415 million to $425 million. In describing these disappointing results, the Q3 2024 Earnings Release explained that "[n]et product sales of EYLEA in the third quarter of 2024 were adversely impacted by a lower net selling price compared to the third quarter of 2023." Following this news, analysts at Reuters reported that Regeneron had "reported weaker-than-expected quarterly sales of the higher dose version of its blockbuster eye disease drug Eylea." In relevant part, the Q3 2024 Earnings Release stated:

> Third quarter 2024 U.S. net sales for EYLEA HD® and EYLEA® increased 3% versus third quarter 2023 to $1.54 billion, including $392 million from EYLEA HD

* * *

| ($ in millions) | Q3 2024 | Q3 2023 | % Change |
|---|---|---|---|
| Net product sales: | | | |
| EYLEA HD - U.S. | $      392 | $       43 | * |
| EYLEA - U.S. | 1,145 | 1,448 | (21 %) |
| Total EYLEA HD and EYLEA - U.S. | 1,537 | 1,491 | 3 % |
| Libtayo - Global | 289 | 232 | 25 % |
| Praluent® - U.S. | 53 | 40 | 33 % |
| Evkeeza® - U.S. | 32 | 19 | 68 % |
| Inmazeb® - Global | 35 | 4 | * |
| Total net product sales | 1,946 | 1,786 | 9 % |
| Collaboration revenue: | | | |
| Sanofi | 1,263 | 1,065 | 19 % |
| Bayer | 391 | 377 | 4 % |
| Other | 6 | (3) | * |
| Other revenue | 114 | 138 | (17 %) |
| Total revenues | $   3,720 | $   3,363 | 11 % |

> Total EYLEA HD and EYLEA net product sales in the U.S. increased 3% in the third quarter of 2024 compared to the third quarter of 2023. EYLEA HD was approved by the FDA in August 2023 and net product sales in the third quarter of 2024 were driven by the transition of patients from other anti-VEGF products, including EYLEA, as well as new patients naïve to anti-VEGF therapy. ***Net product sales of EYLEA in the third quarter of 2024 were adversely impacted by a lower net selling price compared to the third quarter of 2023.*** In addition, third quarter 2024 total EYLEA HD and EYLEA net product sales were favorably impacted by

approximately $40 million as a result of higher wholesaler inventory levels for EYLEA HD at the end of the third quarter of 2024 compared to the end of the second quarter of 2024, partially offset by lower wholesaler inventory levels for EYLEA.

170.     On this news, the price of the Company's common stock fell $84.59 per share, or approximately 9.2%, from a closing price of $922.79 per share on October 30, 2024, to a closing price of $838.20 per share on October 31, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

171.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $2.1 billion to repurchase approximately 1,079,733 shares of its own common stock at artificially inflated prices between December 2023 and September 2024.

172.     According to the 2023 10-K, between December 1, 2023 and December 31, 2023, the Company repurchased 558,642 shares of its own common stock at an average price per share of approximately $849.22, for a total cost to the Company of approximately $474,409,959.

173.     As the Company's stock was actually worth only $838.20 per share, the price at closing on October 31, 2024, the Company overpaid by approximately $6,156,235 for repurchases of its own stock between December 1, 2023 and December 31, 2023.

174.     According to the Q1 2024 10-Q, between January 1, 2024 and January 31, 2024, the Company repurchased 75,563 shares of its own common stock at an average price per share of approximately $929.63, for a total cost to the Company of approximately $70,245,632.

175.     As the Company's stock was actually worth only $838.20 per share, the price at closing on October 31, 2024, the Company overpaid by approximately $6,908,725 for repurchases of its own stock between January 1, 2024 and January 31, 2024.

176.    According to the Q1 2024 10-Q, between February 1, 2024 and February 29, 2024, the Company repurchased 103,973 shares of its own common stock at an average price per share of approximately $957.21, for a total cost to the Company of approximately $99,523,995.

177.    As the Company's stock was actually worth only $838.20 per share, the price at closing on October 31, 2024, the Company overpaid by approximately $12,373,827 for repurchases of its own stock between February 1, 2024 and February 29, 2024.

178.    According to the Q1 2024 10-Q, between March 1, 2024 and March 31, 2024, the Company repurchased 134,768 shares of its own common stock at an average price per share of approximately $966.88, for a total cost to the Company of approximately $130,304,484.

179.    As the Company's stock was actually worth only $838.20 per share, the price at closing on October 31, 2024, the Company overpaid by approximately $17,341,946 for repurchases of its own stock between March 1, 2024 and March 31, 2024.

180.    According to the Q2 2024 10-Q, between April 1, 2024 and April 30, 2024, the Company repurchased 224,301 shares of its own common stock at an average price per share of approximately $912.09, for a total cost to the Company of approximately $204,582,699.

181.    As the Company's stock was actually worth only $838.20 per share, the price at closing on October 31, 2024, the Company overpaid by approximately $16,573,601 for repurchases of its own stock between April 1, 2024 and April 30, 2024.

182.    According to the Q2 2024 10-Q, between May 1, 2024 and May 31, 2024, the Company repurchased 213,027 shares of its own common stock at an average price per share of approximately $970.35, for a total cost to the Company of approximately $206,710,749.

183.    As the Company's stock was actually worth only $838.20 per share, the price at closing on October 31, 2024, the Company overpaid by approximately $28,151,518 for

repurchases of its own stock between May 1, 2024 and May 31, 2024.

184.    According to the Q2 2024 10-Q, between June 1, 2024 and June 30, 2024, the Company repurchased 197,096 shares of its own common stock at an average price per share of approximately $1,029.22, for a total cost to the Company of approximately $202,855,145.

185.    As the Company's stock was actually worth only $838.20 per share, the price at closing on October 31, 2024, the Company overpaid by approximately $37,649,278 for repurchases of its own stock between June 1, 2024 and June 30, 2024.

186.    According to the quarterly report on Form 10-Q the Company filed with the SEC on October 31, 2024 for the quarter ended September 30, 2024 (the "Q3 2024 10-Q"), between July 1, 2024 and July 31, 2024, the Company repurchased 210,338 shares of its own common stock at an average price per share of approximately $1,068.59, for a total cost to the Company of approximately $224,765,083.

187.    As the Company's stock was actually worth only $838.20 per share, the price at closing on October 31, 2024, the Company overpaid by approximately $48,459,772 for repurchases of its own stock between July 1, 2024 and July 31, 2024.

188.    According to the Q3 2024 10-Q, between August 1, 2024 and August 31, 2024, the Company repurchased 234,226 shares of its own common stock at an average price per share of approximately $1,152.63, for a total cost to the Company of approximately $269,975,914.

189.    As the Company's stock was actually worth only $838.20 per share, the price at closing on October 31, 2024, the Company overpaid by approximately $73,647,681 for repurchases of its own stock between August 1, 2024 and August 31, 2024.

190.    According to the Q3 2024 10-Q, between September 1, 2024 and September 30, 2024, the Company repurchased 225,046 shares of its own common stock at an average price per

share of approximately $1,118.22, for a total cost to the Company of approximately $251,650,938.

191.    As the Company's stock was actually worth only $838.20 per share, the price at closing on October 31, 2024, the Company overpaid by approximately $63,017,381 for repurchases of its own stock between September 1, 2024 and September 30, 2024.

192.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately ***$310,279,964***.

## DAMAGES TO REGENERON

193.    As a direct and proximate result of the Individual Defendants' conduct, Regeneron will lose and expend many millions of dollars.

194.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, its CFO, and its former CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

195.    Additionally, these expenditures include, but are not limited to, any and all costs incurred by Regeneron in defending against the DOJ Action, other government actions, and any settlements and/or criminal liability stemming from and/or arising from the misconduct alleged herein.

196.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

197.    Such expenditures also include, but are not limited to, the costs associated with the Credit Card Fee Misconduct as well as any associated costs to remediate the misconduct.

198.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

199.    Such expenditures include the $310,279,964 that the Individual Defendants caused the Company to overpay for repurchases of its own stock while the stock price was artificially inflated as a result of the false and misleading statements alleged herein.

200.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

201.    As a direct and proximate result of the Individual Defendants' conduct, Regeneron has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

202.    Plaintiff brings this action derivatively and for the benefit of Regeneron to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Regeneron, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

203.    Regeneron is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

204.    Plaintiff is, and has been at all relevant times, a shareholder of Regeneron. Plaintiff

will adequately and fairly represent the interests of Regeneron in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

205.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

206.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Regeneron's Board consisted of the following thirteen individuals: Defendants Schleifer, Bassler, Brown, Coles, Goldstein, Guarini, Poon, Ryan, Schenkein, Sing, Thompson, Yancopoulos, and Zoghbi (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to seven of the thirteen Director-Defendants that were on the Board at the time this action was filed.

207.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to engage in and/or cause the Company to engage in the Credit Card Fee Misconduct, to make and/or cause the Company to make false and misleading statements and omissions of material facts, and as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by *approximately $310.3 million* for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties,

face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

208.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Regeneron to engage in the Credit Card Fee Misconduct and to issue materially false and misleading statements. Specifically, the Director-Defendants caused Regeneron to issue false and misleading statements which were intended to highlight the sales numbers of Eylea and Eylea HD while downplaying the risk posed to the Company by not disclosing the subsidies it offered to distributors to the proper federal agencies. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

209.    Additional reasons that demand on Defendant Schleifer is futile to follow. Defendant Schleifer founded the Company in 1988 and has served as the Company's President and CEO and as a Company director since then. Since 2023, he has also served as the Co-Chair of the Board. Additionally, Defendant Schleifer serves as a member of the Technology Committee. The Company provides Defendant Schleifer with his principal occupation for which he receives handsome compensation. As such, as the Company admits, he is not an independent director. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term, which allowed them to continue to breach their fiduciary duties to the Company. As the trusted CEO, Defendant Schleifer conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false

and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made or signed many of the false and misleading statements alleged herein. He is also a defendant in the Securities Class Action. Moreover, Defendant Schleifer's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the schemes. For these reasons, too, Defendant Schleifer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

210.     Additional reasons that demand on Defendant Bassler is futile to follow. Defendant Bassler has served as a Company director since 2016. She also serves as a member of the Technology Committee and the Corporate Governance and Compliance Committee. Defendant Bassler received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Bassler solicited the 2024 Proxy Statement, which led to the reelection of Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted, long-time Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Bassler's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate her motive to participate

in the schemes. For these reasons, too, Defendant Bassler breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

211.    Additional reasons that demand on Defendant Brown is futile follow. Defendant Brown has served as a Company director since 1991. He also serves as the Chair of the Technology Committee and as a member of the Corporate Governance and Compliance Committee. Defendant Brown has received and continues to receive handsome compensation for his role as Company director. In addition, Defendant Brown solicited the 2024 Proxy Statement, which led to the reelection of Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Brown's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the schemes. For these reasons, too, Defendant Brown breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Additional reasons that demand on Defendant Coles is futile follow. Defendant Coles has served as a Company director since 2017. He also serves as a member of the Audit Committee. Defendant Coles has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Coles solicited the 2024 Proxy Statement,

which led to the reelection of Defendants Guarini, Ryan, Sing, and himself to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Coles breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Defendant Goldstein is futile follow. Defendant Goldstein has served as a Company director since 1991. He also serves as a member of the Technology Committee and the Corporate Governance and Compliance Committee. Defendant Goldstein has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Goldstein solicited the 2024 Proxy Statement, which led to the reelection of Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Goldstein's insider sale made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates his motive to participate in the schemes. For these reasons, too, Defendant Goldstein breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214.    Additional reasons that demand on Defendant Guarini is futile to follow. Defendant Guarini has served as a Company director since September 2023. She also serves as a member of the Audit Committee. Defendant Guarini has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Guarini solicited the 2024 Proxy Statement, which led to the reelection of Defendants Coles, Ryan, Sing, and herself to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Guarini breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

215.    Additional reasons that demand on Defendant Poon is futile follow. Defendant Poon has served as a Company director since 2010 and has served as the Lead Independent Director since 2023. She also serves as the Chair of the Compensation Committee and as a member of the Corporate Governance and Compliance Committee. Defendant Poon has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Poon solicited the 2024 Proxy Statement, which led to the reelection of Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted, long-time Company director and

Lead Independent Director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Poon's insider sale made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates her motive to participate in the scheme. For these reasons, too, Defendant Poon breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

216.    Additional reasons that demand on Defendant Ryan is futile follow. Defendant Ryan has served as a Company director since 2003. He also serves as the Chair of the Corporate Governance and Compliance Committee and as a member of the Audit Committee. Defendant Ryan has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Ryan solicited the 2024 Proxy Statement, which led to the reelection of Defendants Coles, Guarini, Sing, and himself to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Ryan's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the schemes. For these reasons, too, Defendant Ryan breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217.    Additional reasons that demand on Defendant Schenkein is futile follow. Defendant Schenkein has served as a Company director since September 2023. He also serves as a member of the Technology Committee. Defendant Schenkein has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Schenkein solicited the 2024 Proxy Statement, which led to the reelection of Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Schenkein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant Sing is futile follow. Defendant Sing has served as a Company director since 1988. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Sing has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Sing solicited the 2024 Proxy Statement, which led to the reelection of Defendants Coles, Guarini, Ryan, and himself to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct

and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Sing's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. For these reasons, too, Defendant Sing breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219.    Additional reasons that demand on Defendant Thompson is futile follow. Defendant Thompson has served as a Company director since 2022. He also serves as a member of the Technology Committee. Defendant Thompson has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Thompson solicited the 2024 Proxy Statement, which led to the reelection of Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Thompson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220.    Additional reasons that demand on Defendant Yancopoulos is futile follow. Defendant Yancopoulos has served as a Company director since 2021 and has served as the Co-Chair of the Board since June 2023. He also serves as a member of the Technology Committee.

The Company provides Defendant Yancopoulos with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. In addition, Defendant Yancopoulos solicited the 2024 Proxy Statement, which led to the reelection of Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted, long-time Company director and the Co-Chair of the Board, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Yancopoulos's insider sale made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates his motive to participate in the scheme.  For these reasons, too, Defendant Yancopoulos breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

221.    Additional reasons that demand on Defendant Zoghbi is futile follow. Defendant Zoghbi has served as a Company director since 2016. She also serves as a member of the Technology Committee and the Compensation Committee. Defendant Zoghbi has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Zoghbi solicited the 2024 Proxy Statement, which led to the reelection of Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company. As a trusted, long-time Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to make false and misleading statements, consciously disregarded her

duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Zoghbi's insider sale made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates her motive to participate in the scheme. For these reasons, too, Defendant Zoghbi breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

222.    Additional reasons that demand on the Board is futile follow.

223.    Defendant Sing (as Chair), Coles, Guarini, and Ryan (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the Credit Card Fee Misconduct and the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions, including as it pertained to the Credit Card Fee Misconduct; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

224.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the schemes to cause the Company to engage in the Credit Card Fee Misconduct and to

issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity; failing to avoid conflicts of interest; failing to ensure the Company's disclosures were accurate; failing to ensure the Company complied with applicable laws, rules, and regulations; failing to prevent the Company from participating in the Credit Card Fee Misconduct; and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

225.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from calling into question the other Individual Defendants' conduct or taking any remedial actions to redress the conduct alleged herein. For instance, none of the Individual Defendants have sought to enforce Regeneron's Misconduct Recoupment Policy which provides for "recoupment or reduction [] of incentive compensation awarded to our officers and other specified employees for compliance violations, which applies to bonus and other incentive compensation regardless of whether paid or payable in cash, equity, or otherwise and regardless of whether such compensation has been earned or vested." For these reasons too, demand on the Director-Defendants would be futile.

226.    Regeneron has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for

Regeneron any part of the damages Regeneron suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

227.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

228.    The acts complained of herein constitute violations of fiduciary duties owed by Regeneron's officers and directors, and these acts are incapable of ratification.

229.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Regeneron. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Regeneron, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

230.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Regeneron to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

231.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

232.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

233.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

234.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false

or misleading." 17 C.F.R. § 240.14a-9.

235.     Under the direction and watch of Defendants Schleifer, Bassler, Brown, Coles, Goldstein, Guarini, Poon, Ryan, Schenkein, Sing, Thompson, Yancopoulos, and Zoghbi, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

236.     The 2024 Proxy Statement also failed to disclose that: (1) the Company paid credit card fees to distributors so those distributors would not charge Eylea customers extra for use of a credit card; (2) these payments were considered a subsidy for customer purchases of Eylea which ultimately lowered the price of the product; (3) by not reporting these payments, the Company reported a higher ASP than Eylea actually had to federal agencies in violation of the False Claims Act; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

237.     In exercise of reasonable care, Defendants Schleifer, Bassler, Brown, Coles, Goldstein, Guarini, Poon, Ryan, Schenkein, Sing, Thompson, Yancopoulos, and Zoghbi should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to the re-election

of Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term.

238.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Coles, Guarini, Ryan, and Sing to the Board for a three-year term, which allowed them to continue to breach their fiduciary duties to the Company.

239.    The Company was damaged as a result of Defendants Schleifer's, Bassler's, Brown's, Coles's, Goldstein's, Guarini's, Poon's, Ryan's, Schenkein's, Sing's, Thompson's, Yancopoulos's, and Zoghbi's material misrepresentations and omissions in the 2024 Proxy Statement.

240.    Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

241.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242.    The Individual Defendants, by virtue of their positions with Regeneron and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Regeneron and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Regeneron to engage in the illegal conduct and practices complained herein.

243.    Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

244.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

245.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Regeneron. Not only is Regeneron now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Regeneron by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *1,079,733* of its own shares at artificially inflated prices, damaging Regeneron.

246.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

247.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Regeneron not misleading.

248.    The Individual Defendants as top executives and directors acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the

scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

249.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

250.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

251.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Regeneron's business and affairs.

252.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

253.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Regeneron.

254.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Credit Card Fee Misconduct.

255.     In breach of their fiduciary duties owed to Regeneron, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company paid credit card fees to distributors so those distributors would not charge Eylea customers extra for use of a credit card; (2) these payments were considered a subsidy for customer purchases of Eylea which ultimately lowered the price of the product; (3) by not reporting these payments, the Company

reported a higher ASP than Eylea actually had to federal agencies in violation of the False Claims Act; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

256.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

257.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

258.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase over one million shares of its own common stock at artificially inflated prices before the fraud was exposed, while ten of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $147.6 million.

259.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Credit Card Fee Misconduct and to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations or to prevent the Company from engaging in the Credit Card Fee Misconduct. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

260.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

261.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Regeneron has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

262.    Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

263.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

264.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Regeneron.

265.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Regeneron that was tied to the performance or artificially inflated valuation of Regeneron, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

266.    Plaintiff, as a shareholder and representative of Regeneron, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

267.    Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

268.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

269.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Regeneron, for which they are legally responsible.

270.    As a direct and proximate result of the Individual Defendants' abuse of control, Regeneron has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

271.    Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

272.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

273.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Regeneron in a manner consistent with the operations of a publicly held corporation.

274.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Regeneron has sustained and will continue to sustain significant damages.

275.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

276.    Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

277.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

278.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action and the DOJ Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

279.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

280.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

281.    Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Schleifer, Landry, and Fenimore for Contribution Under Sections 10(b) and 21D of the Exchange Act

282.    Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

283.    Regeneron and Defendants Schleifer, Landry, and Fenimore are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated

thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Schleifer's, Landry's, and Fenimore's willful and/or reckless violations of their obligations as officers, directors, and/or former officers Regeneron.

284.    Defendants Schleifer, Landry, and Fenimore, because of their positions of control and authority as officers, directors, and/or former officers of Regeneron, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Regeneron, including the wrongful acts complained of herein and in the Securities Class Action.

285.    Accordingly, Defendants Schleifer, Landry, and Fenimore are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

286.    As such, Regeneron is entitled to receive all appropriate contribution or indemnification from Defendants Schleifer, Landry, and Fenimore.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Regeneron, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Regeneron;

(c)    Determining and awarding to Regeneron the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and

severally, together with pre-judgment and post-judgment interest thereon;

        (d)    Directing Regeneron and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Regeneron and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

        1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

        2. a provision to permit the shareholders of Regeneron to nominate at least seven candidates for election to the Board;

        3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

        (e)    Awarding Regeneron restitution from the Individual Defendants, and each of them;

        (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 22, 2025

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
Elizabeth Donohoe
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
          shashmi@thebrownlawfirm.net
          edonohoe@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION OF LAWRENCE HOLLIN</u>

I, Lawrence Hollin, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: <u>1/17/2025</u>

Signed by:

*Lawrence Hollin*
940EF71032E3440...

<u>Lawrence Hollin</u>